UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TONY B. GASKINS,
        Plaintiff,


        v.                                          CIVIL ACTION NO.
                                                    05-10858-GAO


CARL SINGLETARY, Doctor;
STANLEY GALAS, Nurse Practitioner;
SUSAN J. MARTIN; DAVID NOLAN,
Superintendent; and LISA MITCHELL,
Deputy Superintendent,
        Defendants.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANT NOLAN AND MARTIN'S MOTION TO DISMISS AND/OR**
**MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 15); PLAINTIFF'S**
**MOTION TO STAY PROCEEDINGS ON DEFENDANTS MOTION TO DISMISS**
**AND/OR MOTION FOR SUMMARY JUDGMENT, AND TO PERMIT DISCOVERY**
**BY PLAINTIFF (DOCKET ENTRY # 19); DEFENDANTS STANLEY GALAS**
**AND CARL SINGLETARY, M.D.'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 32)**

**July 31, 2006**

**BOWLER, U.S.M.J.**

Pending before this court are two summary judgment motions
(Docket Entry ## 15 & 32) in this civil rights action under 42
U.S.C. § 1983 ("section 1983") filed by plaintiff Tony B. Gaskins
("Gaskins"), an inmate housed at the Massachusetts Correctional
Institute in South Walpole, Massachusetts ("MCI-Cedar Junction").

The amended complaint alleges that defendants Susan J.
Martin ("Martin"), Director of Health Services for the Department
of Correction, David Nolan ("Nolan"), Superintendent of MCI-Cedar
Junction, Lisa Mitchell ("Mitchell"), Deputy Superintendent of
MCI-Cedar Junction, Carl Singletary, M.D. ("Dr. Singletary"),

Medical Director at MCI-Cedar Junction during the relevant time
period, and Stanley Galas ("Galas"), a nurse practitioner
employed by University of Massachusetts Correctional Health
Services ("UMCH") as the Health Services Administrator at MCI-
Cedar Junction, were deliberately indifferent to Gaskins' medical
needs following shoulder surgery in contravention of the Eighth
Amendment.  In particular, Gaskins complains about the delay in
receiving physical therapy and, once provided, the inadequate
number of sessions.[1]  Because of inadequate post surgical care,
Gaskins submits that he is in constant pain, making it difficult
to sleep, and suffers from limited mobility in his right arm and
the loss of a large amount of muscle mass.  (Docket Entry # 9).

Nolan, Mitchell and Martin move for summary judgment[2] on the

---

[1]  For example, at various points in the opposition as well
as in the amended complaint, Gaskins asserts that Nolan, Mitchell
and Martin were deliberately indifferent "due to the long delay
it took after surgery to begin physical therapy."  (Docket Entry
# 41, p. 6).  Once therapy began, Gaskins asserts that "it only
occurred once every two to three weeks in complete contrast to
doctors orders."  (Docket Entry # 41, p. 8).  The five counts in
the amended complaint uniformly allege Eighth Amendment
violations separately against each defendant based upon the delay
in not immediately receiving the physical therapy or the failure
to provide "proper and timely" post surgery care.  (Docket Entry
# 9).

[2]  Nolan, Mitchell and Martin style their motion as a motion
to dismiss and/or for summary judgment.  In support thereof, they
filed an affidavit and relevant medical records.  In reply,
Gaskins opposed the motion by filing *inter alia* an affidavit.
Given the absence of unfair surprise, the motion is properly
treated as one for summary judgment.  <u>See</u>, <u>e.g.</u>, <u>Condon v. Local
2944, United Steelworkers of America AFL-CIO, CLC</u>, 683 F.2d 590,
593-94 (1st Cir. 1982) (allowing motion for summary judgment
without notice where motion titled "motion to dismiss or, in the

basis that they were not deliberately indifferent to Gaskins'
medical needs and they were not personally involved in any
constitutional violation.  They additionally submit that
supervisory liability is absent and assert an entitlement to
qualified immunity.  (Docket Entry # 15).  Dr. Singletary and
Galas seek summary judgment on the basis that they were not
deliberately indifferent within the meaning of the Eighth
Amendment.  (Docket Entry # 32).

Viewing the record in Gaskins' favor, who is also proceeding
pro se and therefore entitled to a liberal construction of the
pleadings, the record shows the following.

FACTUAL BACKGROUND

On December 8, 2004, Gaskins, then 37 years old, underwent
arthroscopic surgery on his right shoulder to alleviate shoulder
pain at Lemuel Shattuck Hospital Correctional Unit ("LSH") in
Jamaica Plain, Massachusetts.  During the one to two year period
prior to surgery, Gaskins received three cortisone injections,
physical therapy and non-steroidal anti-inflammatory medications
("NSAIDS").  He had experienced chronic right shoulder pain with
little relief from the cortisone injections.  An x-ray taken on
November 22, 2004, revealed no space at the "AC joint."  After an
orthopedic consultation that same day at LSH, the decision to

_____

alternative, for summary judgment," accompanied by lengthy
memorandum and affidavit).

operate was made given the diagnosis of an impingement syndrome and a mass in the right shoulder. Dr. Singletary initialed the LSH consultation report prior to the surgery.

Adriana Carrillo, M.D. ("Dr. Carrillo"), an orthopedic surgeon at LSH, performed the operation which proceeded without incident and included the removal of the mass and a distal clavicle resection. The pathology report the same day confirmed the presence of degenerative joint disease and tissue consistent with lipoma.

Dr. Carrillo discharged Gaskins from LSH the same day with instructions to maintain the right shoulder in a sling and keep the dressing dry. She also ordered "Tylenol #3" with codeine for three days, Naprosyn at a 500 milligram dose and the removal of the surgical staples in ten days. Gaskins, however, only took the Tylenol for the next 24 hours.

Upon arriving at MCI-Cedar Junction, Gaskins spent the night at the facility's Health Services Unit ("HSU") where he remained until the afternoon of December 9, 2004. The dressing remained clean and dry. On December 9th, Gaskins reported that his arm was "'throbbing' a little" but that he felt "okay." (Docket Entry # 41, Attached Records). Upon discharge that afternoon, Gaskins returned to his unit. At that time, Gaskins "was housed in 10 Block segregation on awaiting action status." (Docket Entry # 40).

On December 13, 2004, Gaskins returned to HSU. His dressing

was changed, the area cleaned and the staples noted as intact.
Gaskins reported "mild discomfort." (Docket Entry # 41, Attached
Records). He received additional medical attention at HSU the
following day whereupon his dressing was changed and the area
cleaned. Medical records reflect that he only reported an
itching sensation in the anterior section of the staples.

He did, however, complain to both Nolan, Mitchell and
unidentified "medical staff" about his need for "better pain
medication." (Docket Entry # 40). Gaskins' sister then
telephoned Mitchell and demanded that Gaskins receive "proper
medical attention." Id.

Having complained to Mitchell, Nolan and his sister, Gaskins
was again seen at HSU by a nurse practitioner on December 15,
2004. Progress notes reflect "that he felt his pain was being
poorly controlled." (Docket Entry # 41, Attached Records). Upon
examining Gaskins, the nurse practitioner reported that the
staples and incision remained intact and the dressing dry. She
further noted a full range of motion in "hand/fingers" albeit
with "minor finger edema." Id. Notably, the nurse added Motrin
at a 600 milligram dose to the list of approved medications,
discontinued Naprosyn, continued APAP[3] and also approved Ultram
for a five day period. Gaskins discontinued the Ultram after one
day due to nausea and described the Motrin as "ineffective."

---

[3] Although not defined in the record, APAP is a brand name
for the analgesic Acetaminophen. See www.rxlist.com.

(Docket Entry # 40).  On a scale of one to ten, with ten being the greatest level of pain, Gaskins reported that, at its worse, the pain was a level six.

Gaskins received additional medical attention the next day again at HSU.  His dressing was changed and the area surrounding the staples cleaned.  There was no sign of infection and Gaskins did not voice any complaint.  The shoulder remained in a sling.  On December 17, 2004, Dr. Singleton approved an extension of the medical order not to handcuff Gaskins' right arm.

Gaskins returned to HSU on December 18, 2004.  He declined to have the staples removed, however, preferring instead to have a physician perform the procedure.  Progress notes describe the shoulder as "healing well."  Id.  The area around the shoulder was cleaned and the dressing changed on both the December 19 and 20, 2005 visits to HSU.  At the December 20th visit, Gaskins refused pain medication.

On December 27, 2004, Gaskins returned to LSH for a two week post surgery follow up appointment.  Staples were removed.  His range of motion was described as limited and he reported experiencing pain.  The LSH consultant instructed Gaskins to avoid lifting more than five pounds and extending his arm.  Significantly, the consultant also instructed Gaskins in pendulum exercises.  Dr. Singletary's stamped signature dated January 6, 2005, appears on the consultation form.

Gaskins returned to LSH for a follow up appointment on

6

January 10, 2005.  Dr. Carrillo examined Gaskins and noted that the surgical wounds were "healing well" with "minimal edema." (Docket Entry # 16, Ex. 1, Pt. 2).  Gaskins reported "a lot of pain in the right shoulder" and that he had "been doing the pendulum exercises."  Id.  It is during this visit that Dr. Carrillo placed the initial order for occupational therapy.[4]  The order, which Gaskins repeatedly emphasizes,[5] reads as follows:

> Patient has very decreased ROM, he need[s] to start OT for ROM and strengthening of the right shoulder, 2 times a week for 4 weeks, continue codman exercises, he was given also some exercises and a theroband[.]  If ROM does not improved[sic] and pain does not decreased[sic] by next follow up visit he may need MUA.

Id.  Dr. Carrillo did not prescribe pain medications.  She did, however, note the need for a follow up appointment in four weeks and prohibited handcuffing of Gaskins' right arm.

That same day, Gaskin received occupational therapy at LSH. The therapist instructed Gaskins in range of motion and strengthening exercises which Gaskins demonstrated the ability to perform.  The strengthening exercises included isometric

_____

[4]  Gaskins attests that Dr. Carrillo informed Gaskins it was time for him to begin physical therapy and that she would schedule sessions so that he could work with weights.  Although the isometric exercises would increase his range of motion, she advised him that it was important to work with weights to build back the muscle strength lost as a result of the surgery.  The foregoing information is not contained in Dr. Carrillo's consultation report.

[5]  Gaskins bases his claim of a delay in receiving physical therapy primarily upon this order as well as a March 10, 2005 order.

7

exercises as well as exercises performed with a Theraband. Although provided with a Theraband, a sergeant confiscated the band for security reasons when Gaskins returned to MCI-Cedar Junction.

On January 18, 2005, Dr. Singletary initialed a stamped signature of his name on both Dr. Carrillo's report containing the order and the January 10th occupational therapy progress note containing the foregoing information regarding the strengthening exercises and prescribed occupational therapy.  Dr. Singletary therefore knew about the January 10th prescribed occupational therapy.  He also knew that Gaskins had already received occupational therapy at LSH, including instruction in strengthening exercises, that same day and had "demonstrated [an] ability to do all exercises," including "strengthening exercises."[6]  (Docket Entry # 16, Ex. 1, Pt. 2).  Dr. Singletary also initialed and approved a consultation request on January 18, 2005, allowing Gaskins to have an orthopedic follow up appointment at LSH on March 10, 2005.  Like the LSH occupational therapy progress note, the consultation request notes Gaskins'

_____

[6]  The January 10th occupational therapy progress note initialed by Dr. Singletary reads, in full, as follows:

Pt. was instructed in ROM and strengthening exercises.  He demonstrated ability to do all exercises.  Strengthening exercises included isometric and Theraband.  He was given written instructions for all exercises and also given Theraband.

(Docket Entry # 16, Ex. 1, Pt. 2).

referral to occupational therapy.[7]

Relatively little took place in the context of Gaskins' care from January 19th to the March 10th follow up appointment at LSH.[8] On February 15, 2005, Dr. Singletary approved extending the existing medical restriction prohibiting handcuffing Gaskins' right shoulder until March 10, 2005. The record fails to reflect that Gaskins completed a sick call form requesting the physical therapy, filed a grievance regarding the lack of physical therapy or otherwise brought the failure to follow through with the prescribed physical therapy to the attention of any defendant during this time period.[9] At most, Gaskins complained to unidentified "medical staff" at unidentified time periods about the confiscation of the Theraband "and nobody did anything." (Docket Entry # 40).[10]

---

[7]    A consultation request specifically requesting physical therapy, however, was not prepared by a nurse practitioner until March 24, 2005. Dr. Singletary approved that request on March 29, 2005.

[8]    Gaskins' post January 18, 2005 grievance forms and sick call requests date from March 10, 2005 forward.

[9]    Gaskins avers that, "Everytime I was seen by medical staff, I always complained about the pain I constantly endure." (Docket Entry # 40). The medical records, however, reflect that Gaskins was not seen by medical staff during the January 19th to March 9, 2005 time period.

[10]    In contrast to Gaskins' affidavit (Docket Entry # 40), which is signed under the pains and penalties of perjury, the amended "verified" complaint (Docket Entry # 9) is only "verified" as being "true and accurate" with no mention of being signed under the pains and penalties of perjury. See 28 U.S.C. § 1746; Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v.

At the March 10th follow up appointment, Mary Connolly ("Connolly"), a physician assistant,[11] described Gaskins as able to perform a full range of motion.  His right shoulder, however, remained "very weak."  (Docket Entry # 41, Attached Records). Connolly additionally noted the existence of muscle atrophy "at the supraspinatus area."[12]  Id.  In the consultation report, she warned that Gaskins:

> needs Physical Therapy for muscle strengthening or he will injure another area as he attempts to compensate.  I understand he is in segregation and cannot have the Theraband so please send in for therapy 2X week.

Id.

Galas responded to the physical therapy order within one week and Dr. Singletary responded within nine days.  In particular, on March 17, 2005, Galas completed a referral form

_____

Medfit International, Inc., 982 F.2d 686, 689-690 (1st Cir. 1993) (noting that pursuant to 28 U.S.C. § 1746 "an unsworn statement *signed under penalty of perjury* may be used, in lieu of a sworn statement or affidavit, to support or oppose a motion for summary judgment") (emphasis added).  Statements therein about complaints made to Nolan and Mitchell at undetermined times (Docket Entry # 9, ¶ 17) are not in the proper form and therefore not part of the summary judgment record.  See Kenda Corp., Inc. v. Pot O'Gold Money Leagues, 329 F.3d 216, 225 n. 7 (1st Cir. 2003) (finding that pro se plaintiff's failure to develop legal argument resulted in waiver inasmuch and citing case for principle that "'[p]ro se status does not insulate a party from complying with procedural and substantive law'").

[11]  The LSH form reflecting the visit references the ordering physician as Dr. Carrillo.

[12]  The supraspinatus is a "muscle originating above the spine of the scapula and inserted on the greater tubercle of the humerus."  Blakiston's Gould Medical Dictionary (4th ed. 1979).

10

for the physical therapy.  Consistent with Dr. Carrillo's and
Connolly's opinion, Galas posited that Gaskins needed the therapy
twice a week to increase muscle strength.

Upon returning to MCI-Cedar Junction from the March 10th LSH
visit, Gaskins immediately filed a grievance with UMCH about not
receiving the physical therapy.  In the grievance, he alleged
that, "Today I found out that my shoulder has 'No' muscle mass
and that it can be permanently damaged because it did not receive
the ordered physical therapy."  (Docket Entry # 41, Attached
Records).  As the requested remedy, Gaskins asked for another
order not to be handcuffed behind the back.[13]  Galas responded to
the grievance by advising Gaskins that he needed to be assessed
by a provider and was scheduled to see a provider the following
week.  On March 30, 2005, Dr. Singletary approved an extension of
the order limiting restraints to waist chains only until June 29,
2005.

In conjunction with the March 10th grievance, a paralegal
from the Massachusetts Correctional Legal Services office in
Boston wrote a letter dated March 11, 2005, alerting Galas to the
need to address Gaskins' lack of physical therapy.  The letter
was copied to Martin's attention.  The paralegal noted that if
Gaskins could not have the Theraband for security concerns then
Galas should arrange an alternate physical therapy plan.  By

---

[13]  The February 15, 2005 order was due to expire on March
10, 2005.

letter dated April 4, 2005, Galas replied that Gaskins was scheduled for physical therapy and HSU would continue to monitor and treat his condition.  The reply letter was also copied to Martin.

On March 22, 2005, however, Gaskins "was transferred to the [Department Disciplinary Unit] due to behavioral problems." (Docket Entry # 36).  On March 23, 2005, Gaskins completed one of several sick call requests asking "to be seen."  (Docket Entry # 41, Attached Records).  The request was received on March 27, 2005, and responded to inasmuch as a nurse practitioner examined Gaskins on March 29, 2005.  The nurse practitioner noted some swelling and tenderness as well as a limited range of motion. More significantly, the nurse practitioner stated on the UMCH sick form that Gaskins reported that the Ultram helped with the pain and he denied needing other analgesics.

Two days later on March 25, 2005, Gaskins filed another grievance with UMCH again complaining about the lack of physical therapy and the development of scar tissue in his right shoulder. On March 29, 2005, Dr. Singletary approved a consultation request prepared by a nurse practitioner for an April 5, 2005 physical therapy appointment and an April 14, 2005 follow up orthopedic appointment.  Also on March 29, 2005, Dr. Singletary initialed his stamped signature on Dr. Carrillo's March 10th consultation report, which at that point contained a March 25, 2005 handwritten notation stating that the physical therapy and follow

12

up orthopedic consultation appointments had been made.[14]   On
March 29, 2005, another nurse practitioner prepared a similar
consultation request for Gaskins to receive the physical therapy
on April 5th off site at a specialty clinic.

Gaskins received a complete physical therapy evaluation on
April 5, 2005.  The therapist instructed Gaskins about various
exercises, which Gaskins performed, and provided Gaskins with
informational handouts.  Upon examination, the therapist decided
that Gaskins only needed therapy two to four times a month and
scheduled a follow up appointment for April 25, 2005.  The four
week goal was to decrease pain and to increase range of motion.
The therapist further noted that Gaskins was experiencing
increased pain, decreased function and decreased range of motion.
The therapist posited that Gaskins was "a good candidate for
[physical thera[py]."  (Docket Entry # 41, Attached Records).

On April 11, 2005, Gaskins filed another grievance with
UMCH.  He alleged therein that "physical therapy may not undo the
damage already done" and, as a result, he would "be forever
disabled."  Id.

When Gaskins saw Connolly at LSH on April 14, 2005, she did
not alter the decision made by the physical therapist for visits
two to four times a month.  Noting that Gaskins was receiving
physical therapy, she described him as demonstrating "a good

---

[14]   The March 25th handwritten note reads as follows:  "f/o
for ortho + PT consult done."

understanding of exercises." (Docket Entry # 16, Ex. 1, Pt. 2).

Rather then set a follow up appointment, she noted that Gaskins

should return to the LSH clinic in two to three months if he

still had complaints. Dr. Singletary initialed her consultation

report on April 28, 2005.

Gaskins' second physical therapy visit took place as

scheduled on April 25, 2005. Gaskins complained about his

shoulder feeling stiff and painful. The therapist noted that

Gaskins continued to feel pain with daily activities. In

response, the therapist therefore advised Gaskins to avoid

certain exercises including push ups, laterals, flies and bench

presses. A follow up appointment was scheduled for May 13, 2005,

and Dr. Singletary initialed the therapy notes on April 28, 2005.

On April 28, 2005, Gaskins submitted another sick call

request. UMCH responded quickly and Dr. Singletary examined

Gaskins six days later on May 4, 2005, at HSU. He decided to

prescribe APAP for the pain and NSAIDS if Gaskins needed

additional analgesics.

Gaskins returned for physical therapy on May 13, 2005. He

described his shoulder as feeling "'stiff'" but hurting only "'a

little.'" (Docket Entry # 16, Ex. 1; Docket Entry # 36).

Gaskins performed various exercises. The therapist described

Gaskins as "progressing well" with physical therapy and stated

that the pain was not limiting his daily activities. (Docket

Entry # 16, Ex. 1). On May 20, 2005, Dr. Singletary initialed

14

his stamped signature on the physical therapy progress notes.

On June 14, 2005, Gaskins had another physical therapy visit. When he reported doing push ups that resulted in increased pain, the therapist advised him not to perform such exercises and to perform only exercises prescribed by a physical therapist. During a June 29, 2005 physical therapy visit, Gaskins described his shoulder as "really sore." (Docket Entry # 36, Ex. 11). The therapist continued treating Gaskins with various exercises and scheduled a follow up appointment for July 14, 2005.[15] Additional physical therapy visits took place on July 14 and August 2, 2005. Notations describe Gaskins as "progressing well" on July 14th and "'feeling pretty good'" on August 2nd even though his shoulder "'popped' this morning." Id. Gaskins "did not complain of pain." (Docket Entry # 36). On the August 2nd progress note, the therapist depicted Gaskins as "progressing well" and "making gains" in all areas. (Docket Entry # 36, Ex. 11). A follow up was scheduled for August 30, 2005. Dr. Singletary reviewed and initialed the therapy notes on August 11, 2005.

Gaskins complained of pain at the August 30th physical therapy visit but reported doing push ups with the pain. A follow up was scheduled for September 22, 2005, and Dr.

_____

[15]  Dr. Singletary's initials appear on the therapy progress notes next to his stamped signature with the date of July 21, 2005.

Singletary initialed the progress notes on September 7, 2005.


DISCUSSION

Section 1983 provides a cause of action for the deprivation
of an individual's constitutional rights by state actors.
Watterson v. Page, 987 F.2d 1, 7 (1st Cir. 1993) (section 1983
action requires the plaintiff to "show both the existence of a
federal constitutional or statutory right, and some deprivation
of that right as a result of defendants' actions under color of
state law"). To succeed on a section 1983 claim, the plaintiff
must show "(i) that the conduct complained of has been committed
under color of state law, and (ii) that [the alleged] conduct
worked a denial of rights secured by the Constitution or laws of
the United States." Romero-Barcelo v. Hernandez-Agosto, 75 F.3d
23, 32 (1st Cir. 1996) (internal quotation marks omitted).

Defendants, who are all state actors, move for summary
judgment contending there is an absence of a genuine issue of
material fact that they violated the Eighth Amendment.
Defendants are correct.

Under the Eighth Amendment, inadequate medical care claims
are analyzed under a twofold framework laid out in Farmer v.
Brennan, 511 U.S. 825, 834 (1994). See Burrell v. Hampshire
County, 307 F.3d 1, 7 (1st Cir. 2002). First, the deprivation of
medical care must be "objectively, sufficiently serious." Farmer
v. Brennan, 511 U.S. at 834; Burrell v. Hampshire County, 307

16

F.3d at 7.  A sufficiently serious medical need "is one 'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 18 (1st Cir. 1995) (quoting Gaudreault v. Municipality of Salem, Massachusetts, 923 F.2d 203, 208 (1st Cir. 1990)).

Gaskins meets this standard based on Dr. Carrillo's January 10, 2005 order that he needed to begin occupational therapy to increase his range of motion and strengthen his right shoulder. She prescribed such therapy two times a week for four weeks.  The March 10, 2005 orthopedic consultation report repeated and reinforced that Gaskins required physical therapy two times a week.

Under the second prong of an Eighth Amendment inadequate medical care claim "the plaintiff must show that prison officials possessed a sufficiently culpable state of mind, namely one of deliberate indifference to an inmate's health." Burrell v. Hampshire County, 307 F.3d at 7.  State of mind issues such as "deliberate indifference usually present[] a jury question." Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991).

Deliberate indifference is more than mere negligence. Burrell v. Hampshire County, 307 F.3d at 7.  Accordingly, an inadvertent failure to provide medical care such as post surgery therapy is not actionable even if negligent.  Layne v. Vinzant,

17

657 F.2d 468, 471 & 474 (1st Cir. 1981) (Eighth Amendment denial
of medical care based on lack of physiotherapy).

Rather, the required mental state is "akin to criminal
recklessness." Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir.
2005). Deliberate indifference is "a form of scienter in which
the official culpably ignores or turns away from what is
otherwise apparent." Alsina-Ortiz v. LaBoy, 400 F.3d 77, 82 (1st
Cir. 2005) (denial of medical care based upon pattern of failure
to report and refer inmates to health providers). Although more
blameworthy than negligence, the standard "is satisfied by
something less than acts or omissions for the very purpose of
causing harm or with knowledge that harm will result." Calderon-
Ortiz v. Laboy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002).

The "deliberate" part of the deliberate indifference inquiry
requires an actual subjective awareness of the risk." Burrell v.
Hampshire County, 307 F.3d at 8. The official must be both aware
of the "'facts from which the inference could be drawn that a
substantial risk of serious harm exists, *and* he must also draw
the inference.'" Id. at 8 (quoting Farmer v. Brennan, 511 U.S.
at 837; emphasis added). An official is not liable unless he
"knows of and disregards an excessive risk to inmate health or
safety." Farmer v. Brennan, 511 U.S. at 837.

Plaintiff asserts that defendants all knew about his need
for physical therapy and the substantial risk he purportedly

18

faced if not given the physical therapy in a timely manner.
Aware of the risk, defendants deliberately ignored the physical
therapy order, according to Gaskins.

Here, as in <u>Mahan</u> where the corrections officers knew of the
prescription for the anti-depressant and anti-seizure medication
with Mahan's name delivered to the corrections facility, Dr.
Singletary knew of the prescription for physical therapy.  <u>See</u>
<u>Mahan v. Plymouth County House of Corrections</u>, 64 F.3d at 18 (one
component of the subjective awareness requirement satisfied where
officials "were well aware that Tegretol had been prescribed for
Mahan, and that he repeatedly requested it").  On January 18,
2005, Dr. Singletary initialed the March 10, 2005 LSH orthopedic
consultation report.  Accordingly, for purposes of summary
judgment, as of January 18, 2005, Dr. Singletary had actual
knowledge that Gaskins needed physical therapy.

The evidence further shows, however, that Dr. Singletary
knew that Gaskins had already been given a Theraband on March 10,
2005, and instructed in range of motion and strengthening
exercises at the March 10, 2005 LSH occupational therapy
appointment.  Dr. Singletary also knew that Gaskins had
demonstrated an ability to perform all of the exercises.  Thus,
even assuming that Dr. Singletary had actual knowledge of the
Theraband's confiscation,[16] he did not have actual knowledge that

_____

[16] The evidence supporting this assertion rests entirely on
Gaskins' affidavit statement that he "complained to every medical

Gaskins was not performing the range of motion and strengthening exercises or that Gaskins needed a referral to perform the physical therapy.

During the critical time between January 19, 2005, the day after Dr. Singletary initialed the January 10th LSH orthopedic consultation report and the occupational therapy progress note, and March 10, 2005, when Gaskins complained about not receiving the ordered physical therapy in an inmate grievance, there is insufficient evidence to demonstrate that any defendant, including Dr. Singletary and Galas, had actual knowledge that Gaskins needed his or her intervention in order to receive the prescribed physical therapy exercises and that if Gaskins did not receive such physical therapy immediately that he faced a substantial risk of serious harm. See, e.g., Mahan v. Plymouth County House of Corrections, 64 F.3d at 18 (record "contains no evidence from which a rational factfinder could conclude that PHC personnel were informed, or otherwise learned, of the serious symptoms Mahan actually experienced while detained, such as would have made them subjectively aware of a condition requiring their intervention prior to November 21").

This is not a situation where Dr. Singletary, Galas or any other defendant "ignored a clear warning that the medical treatment they provided" for Gaskins "was inadequate." Cf.

---

staff about its confiscation and nobody did anything." (Docket Entry # 40, ¶ 18).

Miranda v. Munoz, 770 F.2d 255, 259 (1st Cir. 1985) (upholding
denial of motion for judgment notwithstanding verdict where "[i]t
could be found that defendants ignored a clear warning that the
medical treatment they provided for Rosario Cristobal was
inadequate, allowing him to deteriorate beyond recovery").  The
January 10, 2005 LSH orthopedic consultation report states only
that Gaskins needs to start occupational therapy for range of
motion and for strengthening his right shoulder two times a week
for four weeks and that he was given exercises and a Theraband.
The January 10, 2005 LSH occupational therapy progress notes show
that Gaskins was given written instructions for all of the
exercises and was also given a Theraband.  There is little, if
any, evidence to show that defendants knew that a Theraband (or a
referral to physical therapy) was required to perform the
exercises to avert a substantial risk of serious harm.

     During this time period, no defendant affirmatively refused
or repeatedly denied a physical therapy referral.  Cf. Gill v.
Mooney, 824 F.2d 192, 195-196 (2nd Cir. 1987) (deliberate refusal
to provide inmate access to prescribed exercise program "on two
separate occasions" coupled with attempt "to discontinue and
rescind the doctor's order" survived Fed. R. Civ. P. 12(b)(6)
dismissal).[17]  Indeed, when Gaskins drew attention to the lack of

_____

     [17]  The decision in Gill, cited repeatedly by Gaskins, is
distinguishable for a number of reasons.  First, although the
Second Circuit decision notes that, "Prison officials are more
than merely negligent if they deliberately defy the express

21

physical therapy with the March 10, 2005 grievance and when

Connolly, in a more direct and explicit manner than Dr. Carrillo,

instructed to "send [Gaskins] in for therapy 2X/week" if he

"cannot have the Theraband," Galas, Dr. Singletary and other

medical personnel responded promptly with a referral to physical

therapy on March 17, 2005, and a number of consultation requests

to receive physical therapy dated March 24 and 29, 2005.

This leads to the second defect in Gaskins' Eighth Amendment

claims, i.e., the lack of an adequate showing of "indifference"

on the part of any defendant sufficient to withstand summary

judgment.  First, where, as here, defendants are unaware of the

substantial risk posed to Gaskins by the confiscation of the

---

instructions of a prisoner's doctors," the case involved far more
deliberate and repetitive conduct than the conduct exhibited by
defendants in the case at bar.  In addition, immediately after
the foregoing language, the court qualified the statement by
stating that, "If defendants deliberately interfered with Gill's
medically prescribed treatment solely for the purpose of causing
him unnecessary pain, they may be subject to liability despite
the likelihood that he suffered no permanent injuries."  Gill v.
Mooney, 824 F.2d at 196.

Second, as exemplified by the latter language, the First
Circuit interprets Gill as stating a claim for relief where
defendants defy a doctor's orders "solely for [the] purpose of
causing [the] prisoner unnecessary pain," DesRosiers v. Moran,
949 F.2d 15, 20 (1st Cir. 1991) (paraphrasing Gill), a
circumstance absent in the case at bar.  The Theraband was
confiscated for security reasons and the March 22, 2005 transfer
to DDU was the result of behavioral problems.  Third, Gill
involved the more lenient Rule 12(b)(6) standard of review as
opposed to the less forgiving summary judgment standard.  See
Burrell v. Hampshire County, 307 F.3d at 9 (distinguishing an
Eighth Amendment case on the basis, in part, that it "was
evaluated under the more lenient standard for dismissal of claims
under Rule 12(b)(6), not as a summary judgment issue").

Theraband or the substantial risk posed by their failure to
affirmatively refer Gaskins to physical therapy or make
alternative arrangements, they cannot be considered
"indifferent." Burrell v. Hampshire County, 307 F.3d at 8
("[p]rison officials cannot be indifferent, of course, if they
are unaware of the risk").

Second, defendants, notably Dr. Singletary and Galas,
responded reasonably. See Burrell v. Hampshire County, 307 F.3d
at 8 (prison officials "cannot be deliberately indifferent if
they responded reasonably to the risk, even if the harm
ultimately was not avoided"). Dr. Singletary knew that Gaskins
had demonstrated an ability to perform physical therapy exercises
and had been given written instructions notwithstanding the
confiscation of the Theraband for security concerns. Dr.
Singletary approved the follow up appointment at LSH for March
10, 2005, and also extended the existing prohibition against
handcuffing Gaskins until the March 10, 2005 return visit.
Gaskins' demonstrated knowledge in performing all exercises as
well as his receipt of written instructions assured Dr.
Singletary that Gaskins' medical care was not wholly devoid of
therapy during this time period.[18]

In addition, Gaskins received a complete physical therapy

_____

[18] Gaskins' November 2005 affidavit avers that the physical
therapist gave him a chart to perform the isometric exercises in
his cell.

evaluation on April 5, 2005.  At that time, the therapist
determined that Gaskins only required physical therapy two to
four times a month.  At the April 14, 2005 follow up appointment
with Connolly at LSH, she did not prescribe additional therapy
sessions.  To the contrary, she described Gaskins as receiving
physical therapy and demonstrating a good understanding of the
exercises.  Given this latest order for physical therapy only two
to four times a month, an order that was not contradicted by
Connolly on April 14th or thereafter, Dr. Singletary, as well as
other defendants, responded reasonably to the risk by deferring
to the therapist and not ordering additional sessions two times a
week.[19]  Nothing in the physical therapy progress notes of April
25, May 13, June 14 and 29, July 14 and August 2 and 30, 2005,
initialed by Dr. Singletary revealed a need to schedule more
frequent sessions.  Accordingly, there is an insufficient showing
for summary judgment purposes that defendants were subjectively
aware of an excessive risk to Gaskins' health posed by the less
frequent physical therapy sessions.[20]  See generally Calderon-
Ortiz v. Laboy-Alvarado, 300 F.3d at 64 (deliberate indifference

---

[19]  On April 25, 2005, Dr. Singletary initialed the physical
therapy evaluation notes and therefore knew about the therapist's
order to treat Gaskins with therapy only two to four times a
month.

[20]  Gaskins argues that "when the time came for the
plaintiff to begin his physical therapy sessions, it only
occurred once every two to three weeks in complete contrast to
the doctors orders."  (Docket Entry # 41, p. 8).

exists "only if the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference'").

An examination of cases involving Eighth Amendment inmate claims to prescribed physical therapy confirms that summary judgment is appropriate. The therapy session provided Gaskins at LSH on January 10, 2005, including the exercises and written instructions, as well as the brief delay between January 18, 2005, when Dr. Singletary first viewed the January 10, 2005 LSH consultation report with the prescribed therapy, and the March 2005 physical therapy referral and consultation requests belies the existence of any deliberate indifference on the part of Dr. Singletary or any other defendant. See Hernandez v. Keane, 341 F.3d 137, 143, 145-146 (2nd Cir. 2003) (Eighth Amendment claim based upon alleged failure to ensure that inmate received prescribed physical therapy following hand surgery amounted to "no more than mere medical practice (if that)" inasmuch as inmate received some physical therapy for his leg, albeit not his hand, and "was given instructions by several doctors on how to perform the necessary therapy on his own hand"), cert. denied, 543 U.S. 1093 (2005); Shell v. Brzeniak, 365 F.Supp.2d 362, 379 (W.D.N.Y. 2005) (denying leave to amend complaint given futility of Eighth Amendment claim alleging, in part, that inmate "was overdue for

physical therapy"); <u>Hanson v. Kaplan</u>, 2005 WL 2209419 at * 5
(E.D. Wis. Sept. 12, 2005) (allowing summary judgment on Eighth
Amendment claim alleging nine month delay in inmate receiving
physical therapy after back surgery); <u>Beedle v. Demasi</u>, 2005 WL
1345341 at * 3 (E.D.Mich. June 3, 2005) (medical director's
"approval of payment for one physical therapy session per week
for three weeks rather than the recommended course of therapy of
three sessions per week for two months does not rise to the level
of an Eighth Amendment violation").

To the extent Gaskins raises additional Eighth Amendment
medical care claims, such as the improper removal of the staples
or the management of post surgery pain medications, they are
unavailing. Neither Dr. Singletary, Galas nor any other
defendant more tangentially involved in Gaskins' care acted in
either a deliberate or indifferent manner. The staples were
removed without incident by a physician as requested by Gaskins.
Defendants were not deliberately indifferent to Gaskins' pain.
To the contrary, Gaskins received a number of different pain
medications which were adjusted at various times to accommodate
his condition. <u>See</u>, <u>e.g.</u>, <u>Mahan v. Plymouth County House of
Corrections</u>, 64 F.3d at 18 (affirming directed verdict for
alleged withholding of prescribed medication).

Separate and apart from the above basis for summary
judgment, brevis disposition for Nolan, Mitchell and Martin is
appropriate given their lack of involvement in Gaskins' care as

well as Martin's lack of deliberate indifference.  At most,
Martin received a copy of the March 11, 2005 letter to Galas from
the Massachusetts Correctional Legal Services paralegal.  She
also received the April 4, 2005, letter, however, stating that
Gaskins was scheduled for physical therapy and that HSU would
continue to monitor his treatment.  Martin therefore was not
aware of facts from which she could or did infer that Gaskins
faced a substantial risk of serious harm.  Given the relatively
prompt response by Galas to the letter and the indication therein
that Gaskins was scheduled for therapy, Martin was not
indifferent to Gaskins' need for physical therapy.

The only other basis for Nolan, Mitchell and Martin's
liability is upon their conduct as supervisors in the delivery of
medical care to MCI-Cedar Junction inmates such as Gaskins.
Supervisory liability, however, is entirely absent.  First,
because neither Dr. Singletary nor Galas acted with deliberate
indifference, neither Nolan, Mitchell nor Martin can be held
liable under section 1983.  See Wilson v. Town of Mendon, 294
F.3d 1, 6-7 (1st Cir. 2002) (if the officer "inflicted no
constitutional harm, neither the municipality nor the supervisor
can be held liable"); accord Torres-Viera v. Laboy-Alvarado, 311
F.3d 105, 108 (1st Cir. 2002) ("failure to state any Eighth
Amendment claim whatsoever dooms [the plaintiff's] supervisory
claim"); Martinez v. Colon, 54 F.3d 980, 990 (1st Cir. 1995).

Second, a supervisory official's liability for the behavior

27

of his subordinate officers exists "where his 'action or inaction
is affirmatively linked to that behavior in the sense that it
could be characterized as "supervisory encouragement, condonation
or acquiescence" or "gross negligence amounting to deliberate
indifference."'" Wilson v. Town of Mendon, 294 F.3d at 6
(internal brackets and ellipses omitted); accord Schmitt v.
Mulvey, 2006 WL 516755 at * 3 (D.Mass. March 1, 2006)
("'supervisory official's liability must stem from his or her own
actions or omissions, which must be "affirmatively connect[ed] to
the subordinate's violative act or omission," and which must
themselves rise to the level of deliberate indifference'").
Simply put, the receipt by a prison supervisor such as Martin of
"letters without responding does not rise to this level."
Schmitt v. Mulvey, 2006 WL 516755 at * 3 (D.Mass. March 1, 2006).

Gaskins also sues all defendants in both their official and
individual capacities.  A section 1983 "damages suit against an
official in an official capacity is tantamount to a suit against
the entity of which the official is an agent (the jail)."
Burrell v. Hampshire County, 307 F.3d at 7; see Hafer v. Melo,
502 U.S. 21, 25 (1991) ("[b]ecause the real party in interest in
an official-capacity suit is the governmental entity and not the
named official, 'the entity's "policy or custom" must have played
a part in the violation of federal law'").  As was the case in
Burrell v. Hampshire County, 307 F.3d at 7 (dismissing official
capacity claim against jail because the entity did not follow "a

policy or custom of deliberate indifference"), there is no evidence to support a claim that the Department of Correction,[21] MCI-Cedar Junction or UMCH followed "a policy or custom of deliberate indifference" in the context of an inmate's need for physical therapy or pain medications following surgery.

As a final matter, on August 5, 2005, Gaskins filed a motion to stay under Rule 56(f), Fed. R. Civ. P. ("Rule 56(f)") (Docket Entry # 19) a ruling on the summary judgment motion filed by Nolan, Mitchell and Martin (Docket Entry # 15) until these defendants responded to Gaskins' request for documents, then being drafted, and the court made a ruling on the motion to amend the complaint. In September 2005, shortly after Gaskins filed the motion, however, the court made a ruling on the motion to amend. (Docket Entry # 22).

Moreover, after filing the motion to stay, Gaskins managed to provide this court with all the necessary documents to properly evaluate Nolan, Mitchell and Martin's summary judgment motion. See generally Filiatrault v. Comverse Technology, Inc., 275 F.3d 131, 138 (1st Cir. 2001). He also fully responded to the merits of the motion. See Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 23 (1st Cir. 1999) ("[o]rdinarily, a party 'may not attempt to meet a summary judgment challenge head-on but fall back on Rule 56(f) if its first effort is

---

[21] As Health Services Director, Martin is presumably an agent of the Department of Correction.

unsuccessful'").

Finally, Gaskins fails to articulate a plausible need for the unidentified documents sought in the request other than a general need to support the claims in the amended complaint. There is no evidence that such documents, if identified and produced, would influence the outcome of the motion for summary judgment filed by Nolan, Mitchell and Martin. See Morrissey v. Boston Five Cents Savings Bank, 54 F.3d 27, 35 (1st Cir. 1995) (strong presumption arises in favor of discovery where *inter alia* party articulates plausible need for discovery and demonstrates that facts are discoverable within reasonable time period which, if adduced, will influence outcome of summary judgment motion); accord Resolution Trust v. North Bridge Association, 22 F.3d 1198, 1203 (1st Cir. 1994).


CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[22] that the motion to stay (Docket Entry # 19) be **DENIED** and the motions for summary judgment (Docket Entry ## 15 &

---

[22] Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order. United States v. Escoboza Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

32) be **ALLOWED**.

              __/s/ Marianne B. Bowler_____
              **MARIANNE B. BOWLER**
              United States Magistrate Judge